**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————

**No. 24-4502**

—————————

UNITED STATES OF AMERICA

Plaintiff – Appellee,

v.

TREMAYNE T. HAWKINS

Defendant - Appellant.

—————————

Appeal from the United States District Court for the Northern District of West Virginia, at Wheeling.  John Preston Bailey, District Judge.  (5:23-cr-00049-JPB-JPM-1)

—————————

Argued:  October 23, 2025                    Decided:  December 11, 2025

—————————

Before BENJAMIN, Circuit Judge, FLOYD, Senior Circuit Judge, and Patricia Tolliver GILES, United States District Judge for the Eastern District of Virginia, sitting by designation.

—————————

Reversed and remanded by published opinion.  Judge Benjamin wrote the opinion, in which Judge Floyd and Judge Giles joined.

—————————

**ARGUED:**  Linn Richard Walker, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Clarksburg, West Virginia, for Appellant.  Clayton John Reid, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.  **ON BRIEF:**  Fred Martin, III, Legal Intern, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Clarksburg, West Virginia, for Appellant.  Randolph J. Bernard, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.

DEANDREA GIST BENJAMIN, Circuit Judge:

The district court denied Defendant Tremayne Hawkins' motion to suppress evidence seized during a traffic stop. For the reasons stated below, we reverse.

## I.

## A.

In the early afternoon, drug task force officers were observing a car while conducting surveillance in an area known to the officers for high-volume drug activity. The car had an expired registration, a dark tint, and a malfunctioning taillight. The officers were familiar with the owner and driver of the car, Cornelious Johnson, because Johnson was on federal supervised release following a 2015 drug conviction. Deandre Williams was in the passenger seat.

The officers followed Johnson and Williams, who eventually arrived and parked at an apartment complex known to the officers from prior drug investigations. In the apartment parking lot, a man in a red jacket named Jackie Byrd approached the car, reached inside, and talked with Johnson and Williams. Byrd was also known to the officers from prior drug investigations. The officers believed they had witnessed a drug deal in the car but did not later testify to seeing any items exchanged in the car or Byrd in possession of anything when he walked away. Johnson and Williams remained inside the car during the interaction with Byrd, which took about two minutes. After Byrd left, Defendant Hawkins approached the car and sat in the back seat. The car then left the apartment parking lot.

2

The task force officers relayed their observations to Officer Brandon Stanley who stopped the car shortly after it left the apartment complex. Stanley initiated the stop because he saw Johnson make an illegal left turn and because the car had a faulty taillight and expired registration. Stanley also stopped the car because he was investigating the possible drug crimes that the task force officers told him about.

Stanley began his investigation by separating the occupants and questioning Williams and Johnson about the interaction with Byrd at the apartment complex. Stanley asked Williams where he was coming from, and Williams answered that they were coming from the apartment complex. Stanley followed up and asked Williams if he met anyone at the apartments, and Williams responded no. Stanley then asked about the man in the red jacket, referring to Byrd, that approached the car. Williams responded that Byrd was asking for a cigarette. Stanley then spoke to Johnson who, like Williams, told Stanley that he was coming from the apartments. When asked about Byrd, however, Johnson said that Byrd was Hawkins' uncle and that Byrd was asking Johnson about a job.

Stanley believed Williams' and Johnson's stories were inconsistent and asked them to wait in the car while he called for a K9 unit. The K9 arrived, sniffed the exterior of the car, and signaled for the presence of drugs. The officers at the scene then had everyone exit the car to conduct a pat-down search of everyone and to search the car. The officers did not find any drugs but did find a firearm in Hawkins' waistband.

The officers asked Hawkins whether he was prohibited from possessing a firearm. Hawkins told the officers that he was not allowed to possess a firearm because he had previously been charged and found guilty of a domestic battery offense.

3

B.

The Government indicted Hawkins for unlawful possession of a firearm pursuant to 18 U.S.C. §§ 922(g)(9), 924(a)(8).  Hawkins moved under Fed. R. Crim. P. 12(b)(3)(C) to suppress the firearm seized from him during the traffic stop.  He argued that the stop was unlawfully extended in violation of the Fourth Amendment because Stanley lacked reasonable suspicion of drug activity.

The district court held an evidentiary hearing and denied Hawkins' motion, finding that Stanley had reasonable suspicion to extend the traffic stop.  The district court relied on several factors, including Johnson's prior drug investigation, the officers' belief that a hand-to-hand drug transaction occurred in the parking lot, the area's reputation for drug trafficking, and Johnson's and Williams' inconsistent statements during the traffic stop.

The Government and Hawkins negotiated a plea agreement that expressly preserved the right to appeal the denial of the motion to suppress.

We have jurisdiction pursuant to 28 U.S.C. § 1291.

II.

"We review the district court's legal conclusions—including determinations of reasonable suspicion and probable cause—de novo, and its factual findings for clear error, construing the facts in the Government's favor." *United States v. Brinkley*, 980 F.3d 377, 383 (4th Cir. 2020) (citation omitted).

4

A.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. CONST. amend. IV. "The Fourth Amendment imposes limits on search-and-seizure powers in order to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976).

A traffic stop is a seizure under the Fourth Amendment and therefore must be reasonable. *See Rodriguez v. United States*, 575 U.S. 348, 355 (2015). "A seizure for a traffic violation justifies a police investigation of that violation." *Id.* at 354. That means, during a traffic stop, "[a]n officer may engage in 'ordinary inquiries incident to' the traffic stop, such as inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants." *United States v. Hill*, 852 F.3d 377, 382 (4th Cir. 2017) (quoting *Rodriguez*, 575 U.S. at 355). A traffic stop can become unreasonable, and therefore unconstitutional, if it "exceed[s] the time needed to handle the matter for which the stop was made." *Rodriguez*, 575 U.S. at 350. The authority for the traffic stop ends when tasks tied to the traffic infraction are completed. *Id.* at 354. At the same time, an officer can extend a traffic stop beyond its original scope if the officer has "either the driver's consent or a 'reasonable suspicion' that illegal activity is afoot." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008).

5

When analyzing reasonable suspicion, courts consider the totality of the circumstances in assessing whether the officer had a particularized and objective basis for suspecting criminal activity. *United States v. Foster*, 824 F.3d 84, 89 (4th Cir. 2016). The "officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). "Seemingly innocent factors, when viewed together, can amount to reasonable suspicion." *Foster*, 824 F.3d at 89. But "the presence of additional facts might dispel reasonable suspicion." *Kansas v. Glover*, 589 U.S. 376, 386 (2020). Courts are "skeptical of Government attempts to spin . . . largely mundane acts into a web of deception." *Foster*, 824 F.3d at 89 (quoting *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011)). "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches." *Terry*, 392 U.S. at 22.

B.

The Government argues that Stanley had reasonable suspicion to extend the traffic stop based on four specific factors: (1) the locations involved, (2) Johnson's 2015 drug conviction, (3) the interaction with Byrd at the apartment complex, and (4) the difference between Williams' and Johnson's statements during the stop.[1]

---

[1] Hawkins argues that the Government cannot rely on the differing statements because the statements occurred after Stanley began investigating matters unrelated to the traffic stop. To Hawkins, Stanley immediately disregarded the initial purpose of the stop and began investigating the alleged drug crimes as soon as he stopped the car. Stanley indeed testified that he did not give anyone a ticket for the traffic violations, that he does not usually give tickets for traffic violations, and that he waited to give Johnson a warning at the end of the stop because he was investigating possible drug crimes. J.A. 97–98. We (Continued)

6

The court's inquiry "must account for the 'totality of the circumstances,' rather than employ a 'divide-and-conquer analysis.' " *United States v. Williams*, 808 F.3d 238, 247 (4th Cir. 2015) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).  But in considering whether the factors articulated by a police officer amount to reasonable suspicion, we will "separately address each of the[] factors before evaluating them together with the other circumstances of the traffic stop." *United States v. Powell*, 666 F.3d 180, 187–88 (4th Cir. 2011); *see, e.g.*, *United States v. Bowman*, 884 F.3d 200, 214–18 (4th Cir. 2018) (considering each factor alone before considering the factors together with the totality of the circumstances).

1.

Presence in a "high crime area" is a relevant contextual consideration but cannot alone create reasonable suspicion of criminal activity. *See United States v. Curry*, 965 F.3d 313, 330 (4th Cir. 2020) (en banc); *Illinois v. Wardlaw*, 528 U.S. 119, 124 (2000) ("[P]resence in an area of expected criminal activity, standing alone, is not enough to support a reasonable particularized suspicion that the person is committing a crime.").  The court reasons that "presence in a high crime neighborhood is a fact too generic and susceptible to innocent explanation to satisfy the reasonable suspicion inquiry." *United States v. Massenburg*, 654 F.3d 480, 488 (4th Cir. 2011) (cleaned up).

Although the officers knew the apartment complex from prior drug investigations, the complex itself was not identified as a high crime area.  Given the court's consistent

---

do not need to address this argument because we conclude that even considering this fact reasonable suspicion does not exist here.

7

statements that presence in a high crime area is a weak and generic factor, the fact that these events occurred in a place merely associated with prior investigations deserves even less weight within the totality of circumstances.

2.

"A prior criminal record is not, standing alone, sufficient to create reasonable suspicion." *Foster*, 634 F.3d at 246–47 (cleaned up). Officers are required to pair their knowledge of a suspect's criminal record with "concrete factors to demonstrate that there was a reasonable suspicion of current criminal activity." *Id.* at 247 (cleaned up). Moreover, "[t]he Fourth Amendment does not allow the Government to label a person as a drug dealer and then view all of their actions through that lens." *United States v. Drakeford*, 992 F.3d 255, 264 (4th Cir. 2021).

Here, Johnson was convicted of a drug offense in 2015 and began his term of supervised release in 2019. There is no evidence that Johnson has not been compliant with the terms and conditions of his release or that Johnson is involved in any criminal activity. We conclude that the interaction in the apartment complex parking lot is not a concrete factor that demonstrates reasonable suspicion of criminal activity. Finding otherwise would be tantamount to labeling Johnson as a drug dealer and viewing the later events through that lens. Without any concrete factors suggesting criminal activity, Johnson's 2015 conviction is inadequate to create reasonable suspicion and also deserves little weight in the totality of the circumstances.

3.

Ordinary gestures, like a handshake, must be accompanied by additional observations, like drugs, money, or concealment, for an officer to reasonably conclude that a drug transaction has taken place. *See Drakeford*, 992 F.3d at 264; *Foster*, 634 F.3d at 247–48. Other additional observations that the court has found suggestive of drug transactions include brief hand-to-hand contact with multiple people and the absence of any meaningful interaction or conversation during those encounters. *See, e.g.*, *United States v. Johnson*, 599 F.3d 339, 345 (4th Cir. 2010) (finding an officer had reasonable suspicion that a person was selling drugs when the officer witnessed that individual making hand-to-hand contact with multiple people without lingering or engaging in conversation with them). But without such specific identifiers, we would be left to rely exclusively on the testimony of the officers,"[b]ut the success or failure of a suppression motion cannot hinge on an officer saying, in essence, 'I know it when I see it,' " *Drakeford*, 992 F.3d at 267 (Wynn, J., concurring).

The Government failed to identify any specific identifiers that suggest Byrd's interaction with Johnson and Williams was a drug transaction. The officers never witnessed a handshake or any items change hands in the car. Byrd remained near the vehicle and spoke with Williams and Johnson for approximately two minutes, which is less suggestive of a drug transaction than an abrupt handshake not accompanied with any conversation. And when he did leave the car, the officers never saw Byrd holding anything in his hands or placing anything in his pockets. Nor did the officers witness multiple people approaching and interacting with the car. Despite the lack of specific identifiers, the

9

officers failed to gain any additional information regarding the interaction when they decided not to question Byrd in the apartment parking lot.  The officers essentially said the interaction was a drug deal because "I know it when I see it."  These facts cannot amount to reasonable, particularized suspicion and deserve little weight in the totality of the circumstances.

4.

Minor and reconcilable inconsistencies between a driver's and passenger's statements do not give rise to reasonable suspicion of criminal activity.  *See United States v. Pack*, 612 F.3d 341, 358–60 (5th Cir. 2010); *see also United States v. Perkins*, 348 F.3d 965, 971 (11th Cir. 2003) ("[T]he answers given by [the driver] and [the passenger] as to whom they were going to see . . . do not support reasonable suspicion.  [The driver] told the officer that he was going to visit his cousin[, and the passenger] told [the officer] that he was going to . . . visit a girl . . . .  [The passenger's] answer did not contradict [the driver's] answer in any way.  [The driver] and [passenger] could have intended to see both persons during their visit, or [the driver] could have intended to visit [his cousin] while [the passenger] visited a girl.").

Here, the inconsistencies between Johnson's and Williams' statements are minor and reconcilable.  Both stated they were coming from the same apartment complex, and both acknowledged their interaction with Byrd.  The fact that Williams stated Byrd was asking for a cigarette and that Johnson stated Byrd was asking about a job are not contradictory.  Both answers could have been true.  Accordingly, we give the minor and reconcilable differences in these statements little weight in the totality of the circumstances.

10

5.

Even though none of the factors above independently provide a basis for a reasonable, articulable suspicion that the occupants of the car were engaged in criminal activity, we still must consider all the factors together. *Bowman*, 884 F.3d at 218–19. "The court 'must look at the cumulative information available to the officer' rather than hold a 'stop unjustified based merely on a piecemeal refutation of each individual fact and inference.' " *Id.* at 218 (quoting *Branch*, 537 F.3d at 337). To find reasonable suspicion based on a combination of innocent factors, the Government must identify concrete reasons to suspect criminal activity. *Bowman*, 884 F.3d at 218–19.

Even combining all the factors identified by the Government, we find no basis for reasonable suspicion that the individuals here were engaged in criminal activity. The drug task force officers saw a short interaction between Byrd, Williams, and Johnson in the apartment parking lot. But the drug task force officers did not see a handshake, drugs, or money. And this interaction took place in the middle of the afternoon, in broad daylight, and in a public place. The fact that the events occurred in an area known to the officers from prior investigations or that Johnson was convicted of a drug crime over ten years ago does not change the analysis of the interaction because the drug task force officers were not permitted to label Johnson as a drug dealer and view all the facts through that lens. Additionally, the minor and reconcilable inconsistencies between the statements taken during the traffic stop do not elevate the officers' hunch that drug activity took place to reasonable suspicion.

Moreover, the Government presents a weaker case for reasonable suspicion here than the government in *United States v. Drakeford*, 992 F.3d 255 (4th Cir. 2021) and *United States v. Bowman*, 884 F.3d 200 (4th Cir. 2018). In *Drakeford*, the officers conducted a stop and frisk based on (1) a confidential informant that provided information that the defendant trafficked cocaine and heroin; (2) officers witnessing what they believed to be a drug transaction in a gas station parking lot where a person exited their car and sat in the defendant's car for 30 to 45 seconds before returning to their car; (3) officers finding syringes in the car of the person who entered the defendant's car; (4) officers witnessing the defendant arrive at a second gas station and wait in his car; (5) officers witnessing the defendant enter a home empty handed, leave carrying bags, and subsequently inform the confidential informant that he had drugs to sell; and (6) an officer believing he witnessed a hand-to-hand drug transaction when the defendant engaged in two handshakes in a parking lot. *Drakeford*, 992 F.3d at 263. In *Bowman*, the officer extended a traffic stop based on (1) apparent nervousness of the defendant; (2) the presence of a suitcase, clothes, food, and an energy drink inside of the car; (3) the defendant's inability to supply the officer with a requested address; and (4) statements that the defendant had been laid off recently and that he had recently purchased the car he was driving. *Bowman*, 994 F.3d at 213. Both of those cases clearly presented more suspicious circumstances than the facts here, yet the court in those cases still found the officers lacked reasonable suspicion.

Accordingly, the facts here taken together failed to create reasonable suspicion sufficient to extend the traffic stop.

12

III.

For the reasons stated above, the district court's denial of Hawkins' motion to suppress is reversed and this case is remanded to the district court for further proceedings.

*REVERSED AND REMANDED*