PRESENT:  Powell, C.J., Kelsey, McCullough, Chafin, Russell, and Mann, JJ., and Millette, S.J.


COMMONWEALTH OF VIRGINIA

OPINION BY
v.  Record No. 250267                              JUSTICE STEPHEN R. McCULLOUGH
April 16, 2026

NAFEESA RAUSHAM KNIGHT-WALKER


FROM THE COURT OF APPEALS OF VIRGINIA

A police officer stopped Nafeesa Rausham Knight-Walker on suspicion of driving on a suspended license.  While the stop was ongoing, the officer inquired about the presence of drugs or weapons in the car.  The questions took approximately twelve seconds.  A divided panel of the Court of Appeals held that these questions impermissibly extended the traffic stop in violation of Knight-Walker's Fourth Amendment rights and that, as a consequence, evidence seized following those questions must be suppressed.  We hold that, under the circumstances of this case, the officer did not impermissibly prolong the stop in violation of the Fourth Amendment.  Therefore, we reverse the judgment of the Court of Appeals.

BACKGROUND

Around 1:30 in the morning, Officer Jordan Allen of the Newport News Police Department noticed that the vehicle in front of his was making frequent lane changes to prevent him from following.  The vehicle was also traveling fifteen miles per hour below the posted speed limit.  Officer Allen ran a license and registration check on the vehicle.  He learned that the owner of the vehicle had a suspended license.  He also pulled up a photograph of the owner of the vehicle.  The photograph appeared to match the driver.  Based on these observations,

Officer Allen activated his lights and pulled over the vehicle. The encounter was captured on his body camera.

Knight-Walker was driving the vehicle. A male passenger was sitting next to her. Less than two minutes after initiating the stop, Officer Allen asked Knight-Walker if there were any weapons in the vehicle. She answered, "no." He obtained Knight-Walker's driver's license. Back in his police vehicle, he learned that her mother was the actual owner of the vehicle. He also determined that Knight-Walker's license was suspended and that she had multiple convictions for driving on a suspended license. He walked back to speak with Knight-Walker.

Officer Allen told Knight-Walker that she had a suspended license and that she could not continue driving the car. He asked the passenger if he could drive. The passenger responded that he could not. Officer Allen then informed Knight-Walker that her driving on a suspended license "is an arrestable offense, it'd be your third time. I'm not going to arrest you for it, ok? I've got no reason to, you've been nice to me and everything. But you can't drive out of here, though, ok." Knight-Walker responded that she understood and that she would call her son to come pick her up.

Fifteen seconds later, the officer said, "[o]k. I know I just asked you, I want to make sure we're on the same page here, no weapons in the vehicle. Do you have any drugs, though, in the car?" Knight-Walker answered, "[n]o, I do not." Officer Allen followed up with, "[n]o marijuana, no cocaine, no heroin, nothing crazy?" This exchange lasted approximately twelve seconds. Knight-Walker answered that she did not have any illegal substances. Officer Allen said "ok" and asked, "do you mind if I check?" Knight-Walker paused for several moments and started to say "um," to which Officer Allen added, "[i]t will be real quick. I just want to make sure there's nothing in the car." Knight-Walker opened the door of her vehicle. Officer Allen

2

thanked her and asked the passenger to step out of the vehicle. The passenger complied. Knight-Walker also exited the vehicle. At the time Officer Allen asked her these questions, he had not issued her a summons or returned her (suspended) driver's license.

Officer Allen then asked Knight-Walker if there was anything on her person. She said "no." He asked her if he could pat her down. She responded with an "mm hmm," indicating her agreement. She then complied with Officer Allen's order to face the vehicle while he conducted the pat down. Officer Allen then asked her if he could search her purse. Knight-Walker held the bag open for Officer Allen, who took it from her and explained that he would give it right back to her. Officer Allen then searched Knight-Walker's purse. Knight-Walker moved to the rear of her vehicle. Officer Allen began to search the car. He found drug paraphernalia in the glove box.

Knight-Walker was later indicted for possession of cocaine. The charge was later amended to possession of controlled paraphernalia. Knight-Walker filed a motion to suppress, contending that the officer's questions impermissibly extended the stop in contravention of *Rodriguez v. United States*, 575 U.S. 348 (2015). Following a hearing, the circuit court denied the motion. The circuit court observed that neither Knight-Walker nor her passenger could drive. Furthermore, the circuit court noted that, as a practical matter, the officer was not going to leave Knight-Walker next to her mother's car, which would give her the opportunity to illegally drive away. The circuit court distinguished *Rodriguez* on the basis that the driver in that case had a valid license and could legally drive away upon the completion of the stop, whereas Knight-Walker could not. Here, the officer did not extend the stop because he had to wait for a person with a valid license to arrive and drive the car away. The circuit court further found that Knight-Walker consented to the search.

Knight-Walker entered a conditional guilty plea that allowed her to appeal the denied suppression motion. She was sentenced to serve twelve months, with twelve months suspended.

Knight-Walker appealed to the Court of Appeals. A divided panel of that court reversed her conviction, reasoning that Officer Allen's questions impermissibly extended the duration of the stop and, as a consequence, the contraband that the officer recovered must be suppressed. *Knight-Walker v. Commonwealth*, Record No. 1118-23-1, 2025 Va. App. LEXIS 43 (Jan. 28, 2025). One judge dissented and would have affirmed the validity of the stop. *Id.*

ANALYSIS

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend IV. A traffic stop constitutes a "seizure" under the Fourth Amendment and is subject to review for reasonableness. *See Whren v. United States*, 517 U.S. 806, 810 (1996). In this instance, the reason for the stop is not at issue. Instead, the defendant challenges the officer's conduct during the stop, arguing that it was impermissibly extended.

A defendant's claim that a seizure occurred in violation of the Fourth Amendment "presents a mixed question of law and fact that is reviewed *de novo* on appeal." *McCain v. Commonwealth*, 261 Va. 483, 489 (2001). In reviewing such a claim, we are "required to give deference to the factual findings of the trial court and to determine independently whether, under the law, the manner in which the evidence was obtained satisfies constitutional requirements." *Id*. at 490.

I. THE OFFICER DID NOT IMPERMISSIBLY EXTEND THE TRAFFIC STOP.

Whether an officer acts reasonably during a traffic stop depends on the circumstances the officer faces. No specific time period determines the acceptable duration of a traffic stop; instead, reviewing courts must evaluate "'what the police in fact do,' and whether the officers

4

acted reasonably under the totality of the circumstances presented to them." *United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017) (quoting *Rodriguez*, 575 U.S. at 357).

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop." *Rodriguez*, 575 U.S. at 354 (citation omitted). A lawful detention does not end until the "tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* "[A traffic] stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (citation omitted). An officer is not permitted to stray from the mission of the traffic stop by engaging in a detour to investigate other crimes. *Rodriguez*, 575 U.S. at 356-57. For example, "a dog sniff [to detect illegal drugs] is not fairly characterized as part of the officer's traffic mission." *Id.* at 356. Inquiries that relate to the mission of the traffic stop include ordinary inquiries incident to the traffic stop and inquiries designed to ensure "officer safety." *Id.* at 355-56.

With respect to the first category, tasks that relate to the mission of the traffic stop, officers may ask questions as they assess whether to issue a traffic ticket, and they may "check[] the driver's license, determin[e] whether there are outstanding warrants against the driver, and inspect[] the automobile's registration and proof of insurance." *Id.* at 355.

In this connection, it is worth noting that "pure small talk, encompassing anodyne conversation" that commonly occurs in the flow of a typical stop does not run afoul of the Fourth Amendment. *United States v. Ross*, 151 F.4th 487, 496 (3rd Cir. 2025). Such small talk "carries no constitutional significance and instead simply rides sidecar to the stop's mission." *Id.* An officer's "common greetings and courtesies," such as "pleasantries about the weather . . . are

5

neither investigatory in nature, nor do they meaningfully prolong the stop. They are customary cultural expectations and practices." *Id.*

In the second category, ensuring officer safety, the Supreme Court has observed that traffic stops are "especially fraught with danger to police officers, so an officer may need to take certain negligibly burdensome precautions in order to complete the mission safely." *Rodriguez*, 575 U.S. at 356 (quoting *Johnson*, 555 U.S. at 330); *see also Maryland v. Wilson*, 519 U.S. 408, 413 (1997) ("Regrettably, traffic stops may be dangerous encounters."). Permissible inquiries relating to officer safety include conducting a criminal record check, asking a driver to step out of the vehicle, and asking whether there are weapons or anything dangerous in the vehicle. *Rodriguez*, 575 U.S. at 356; *Pennsylvania v. Mimms*, 434 U.S. 106 (1977); *Ross*, 151 F.4th at 497. Unlike a general interest in criminal enforcement, however, the officer safety issue "stems from the mission of the stop itself." *Rodriguez*, 575 U.S.at 356. Notably, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop, th[e United States Supreme] Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Johnson*, 555 U.S. at 333.

In contending that the seizure exceeded the scope of a permissible traffic stop, Knight-Walker chiefly relies on the United States Supreme Court's *Rodriguez* decision. The issue in that case was "whether the Fourth Amendment tolerates a dog sniff conducted after completion of a traffic stop." *Rodriguez*, 575 U.S. at 350. In *Rodriguez*, an officer stopped a vehicle for driving on the shoulder of the highway. *Id.* at 351. The officer had finished asking the questions related to the traffic stop, completed the necessary paperwork, and returned all the documents to the driver and the passenger of the car. *Id.* at 351-52. Nevertheless, the officer detained the

driver and the passenger so that another officer could arrive with a dog who would sniff for drugs. *Id.* at 352. An additional seven or eight minutes elapsed before the dog alerted to the presence of drugs. *Id.* Charged with the possession of illegal drugs, Rodriguez filed a motion to suppress, contending that once the mission of the traffic stop had ended, police were not free to detain him further. *Id*. at 352. The Supreme Court agreed, holding that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Id*. at 350. Specifically, "[a] seizure justified only by a police-observed traffic violation, therefore, becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Id.* at 350-51 (citation, brackets and quotation marks omitted).

The situation in this case differs from the one the officers confronted in *Rodriguez*. In *Rodriguez*, the officer initiated a separate investigation unrelated to the traffic ticket and he did so after the mission of the traffic stop had ended. Here, the mission of the traffic stop was not complete, even though the officer informed Knight-Walker that he would not arrest her, because Officer Allen had a "further need to control the scene." *Johnson*, 555 U.S. at 333 (citation omitted).

Knight-Walker could not lawfully drive her car due to her suspended license, and her passenger likewise could not drive. She informed the officer that she would be calling her son so that he could pick her up and drive her and the car away. As the circuit court observed, a reasonable officer in these circumstances would not simply drive away from the scene, leaving Knight-Walker with her car keys next to a car she could not lawfully drive. Instead, the officer could sensibly wait for Knight-Walker's son to arrive. The mission of the stop at that point was

7

to ensure that Knight-Walker did not continue to break the law by driving away moments after receiving her summons, not simply to issue a summons.

Practically speaking, the circumstances at hand meant more extended contact between the officer and two persons, Knight-Walker and the passenger. When "there is more than one occupant of the vehicle," it "increases the possible sources of harm to the officer." *Wilson*, 519 U.S. at 413. It was also not clear how long it might take for Knight-Walker's son to arrive. This more extended period of contact reasonably prompted questions from the officer to ensure that there were no additional considerations that could heighten the danger while he completed his enforcement action.

The officer's actions and questions were reasonable under the particular circumstances he faced. The "ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California*, 573 U.S. 373, 381-82 (2014) (citation omitted). "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.'" *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (emphasis in original) (citation omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). Given the misleading confidence of hindsight, the United States Supreme Court has counseled that "judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Ryburn v. Huff,* 565 U.S. 469, 477 (2012) (*per curiam*).

Mindful of that admonition, we recognize that law enforcement officers confront a wide range of situations on a daily basis. Consequently, reviewing courts must give officers some

latitude to protect their own safety. This latitude does not mean that the objective facts should be reviewed with such deference that officer safety systematically defeats the constitutionally protected right of citizens to be free of unreasonable seizures. It does mean, however, that judicial hindsight should be grounded in the reasonableness review that lies at the heart of the Fourth Amendment. As the United States Court of Appeals for the Fourth Circuit observed, "the Supreme Court's decision in *Rodriguez* does not require courts to second-guess the logistical choices and actions of a police officer that, individually and collectively, were completed diligently within the confines of a lawful traffic stop." *Hill*, 852 F.3d at 384. Here, Officer Allen's twelve second exchange, inquiring about weapons, illegal drugs, or "anything crazy," was reasonable under these particular circumstances.

II.     KNIGHT-WALKER'S CONSENT WAS NOT TAINTED.

The Court of Appeals further reasoned that the illegal extension of the stop tainted Knight-Walker's consent and rendered the subsequent search illegal. That conclusion must be reversed because we conclude that the stop was not illegally extended. Moreover, the circuit court found that Knight-Walker's consent was voluntary. "Whether a consent to a search was voluntary 'is a question of fact to be determined from the totality of all the circumstances.'" *Gray v. Commonwealth*, 233 Va. 313, 327 (1987) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). "The mere fact that a defendant is in custody is not enough in itself to demonstrate a coerced consent to search." *Id.* In the present case, the circuit court's finding that Knight-Walker consented to the search is supported by the record. Among other considerations, after viewing the video of the officer's interaction with Knight-Walker, the circuit court observed that the officer "was being polite, she was being polite, everybody was being polite."

9

We further note that there is nothing constitutionally impermissible about an officer asking for consent to search. Asking for consent during the course of a still incomplete traffic stop is not the sort of unconstitutional "detour" envisioned by *Rodriguez*. Instead, consent is a well-established exception to the rule prohibiting officers from extending a traffic stop to investigate unrelated crimes. *United States v. Santos*, 161 F.4th 1007, 1013 (6th Cir. 2025) ("[A] request [for consent] on its own does not impermissibly extend a stop" because it "is itself a request to extend the stop that a driver may deny.").

CONCLUSION

For the reasons noted above, we will reverse the judgment of the Court of Appeals and enter final judgment for the Commonwealth.

*Reversed and final judgment.*