# UNPUBLISHED

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

No. 20-4618

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

HAROLD HALL, JR.,

Defendant - Appellant.

Appeal from the United States District Court for the District of South Carolina at Columbia. Joseph F. Anderson, Jr., Senior District Judge. (3:14-cr-00629-JFA-1)

Argued: September 22, 2021　　　　　　　　　　Decided: December 3, 2021

Before WILKINSON, WYNN, and FLOYD, Circuit Judges.

Affirmed by unpublished opinion. Judge Floyd wrote the opinion in which Judge Wilkinson and Judge Wynn joined. Judge Wilkinson and Judge Wynn wrote separate concurring opinions.

**ARGUED:** Louis H. Lang, CALLISON TIGHE & ROBINSON, LLC, Columbia, South Carolina, for Appellant. Brook Bowers Andrews, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee. **ON BRIEF:** M. Rhett DeHart, Acting United States Attorney, Columbia, South Carolina, Leesa Washington, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenville, South Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

FLOYD, Circuit Judge:

This case is before us for the fourth time on appeal, and it now concerns Appellant Harold Hall, Jr.'s two motions to suppress that were before the district court. Pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), Hall's first motion challenged the validity of a search warrant used to seize evidence within his residence. His second motion sought to exclude statements he made to law enforcement during a traffic stop. The district court denied both motions, holding that any omissions to the warrant were immaterial and the traffic stop was independently justified. We affirm.

I.

A.

In late May or early June 2012, Richland County Sheriff's Department (RCSD) Investigator Kevin Loftis introduced RCSD Investigator John Carwell to a first-time, confidential informant (CI) who "had been charged with some burglaries and wanted to do some work for Richland County." J.A. 195–96. During the introduction, the CI exchanged phone numbers with Investigator Carwell, but he did not contact Investigator Carwell for "weeks or days." J.A. 199. Investigator Loftis did not provide Investigator Carwell with any additional facts about the CI, and Investigator Carwell never conducted any independent research about the CI's background.

On June 25, 2012, the CI contacted Investigator Carwell, stating that he "wanted to do some work that day and had an address that he could purchase marijuana from." J.A. 207. After the call, Investigator Carwell and RCSD Investigator Dave Unger picked up

3

the CI. The CI stated that "he knew there were drugs [at a house] and he could buy from the person that was at that house." J.A. 209. No one ever inquired about how the CI knew there were drugs at the home. Investigator Carwell then drove to a secluded location, searched the CI's person to confirm the absence of drugs, and provided the CI with $85.00 to facilitate a marijuana purchase. At some point, before being dropped off, the CI provided Investigator Carwell with the address where he would make the purchase.

After dropping off the CI within the address's vicinity, Investigator Carwell observed the CI turn left. The left turn placed the CI out of Investigator Carwell's line of sight. However, RCSD Officer Jerry Maldonado was assisting with the continuous surveillance of the CI, and he began observing the CI immediately after the CI completed the left turn. Although Investigator Carwell could no longer see the CI, Officer Maldonado observed the CI walk to the residence, knock on the door, enter and exit the home within seconds, and then walk back in the direction from which he came. He also saw a blue Ford Expedition parked in front of the residence. The entire affair, including the CI's walk to and from the residence, lasted five to ten minutes, all while Officer Maldonado was in constant radio contact with Investigator Carwell.

When the CI returned to Investigator Carwell's vehicle, he provided Investigator Carwell with "$85 worth of marijuana he had in his right front pants pocket." J.A. 218. He further apprised Investigator Carwell that the homeowner was not at the home, so he purchased the marijuana from "somebody else." J.A. 218. The CI did not know the legal name or nickname of the person who sold him the marijuana. And neither the CI, Investigator Carwell, nor Officer Maldonado knew the specific name of who owned the

4

house where the CI completed the purchase.  Investigator Carwell believed the substance provided by the CI was marijuana because it was a "green, leafy material" and "had an odor of marijuana."  J.A. 221.

Two days later, on June 27, 2012, Investigator Carwell applied for and obtained a warrant to search the home itself and all persons and vehicles at the home.  In relevant part from the application, Investigator Carwell explained:

> Within the past seventy-two hours a first time confidential informant of the Richland County Sheriff's Department (RCSD) has bought a quantity of Marijuana from the above location.  The informant was searched prior to entering the residence and after leaving the residence.  The informant was observed by law enforcement entering the residence and leaving the residence. . . . The identity of the informant must remain confidential so as not to impair its future usefulness and endanger its life.  Through the affiant's and other RCSD narcotic officers['] experience in drug enforcement it is known that there is a common connection between drug activity and weapons.  Those engaged in illegal drug activity often carry, or have nearby, weapons ranging from razors to firearms for protection of themselves and their drugs.  Additionally, through the affiant's and other RCSD [n]arcotic officers['] experience in drug enforcement it is known that subjects present at the scene of illegal drug distribution and/or possession commonly have drugs and[/]or weapons concealed on their persons. . . . Through the affiant's and other RCSD [n]arcotic officers experience in drug enforcement, it is known that vehicles owned or operated by subjects present at the scene of illegal drug distribution and/or possession are commonly used to transport and store illegal drugs[.]

J.A. 311–12.  The warrant ultimately authorized the search of the residence as well as "all persons at the location, vehicles at the location owned or operated by persons at the location or owned or operated by persons residing at the location but temporarily absent . . . ."  J.A. 311.

The search warrant was executed on the same day by law enforcement.  Prior to the search, RCSD Officer Brien Gwyn was tasked with surveilling the residence, and he

5

observed two adult males at the scene. One of those adult males, Hall, was making frequent trips from the house to the blue Ford Expedition. Eventually, Hall, the second adult male (later identified as Hall's cousin), and a child entered the vehicle and drove away from the residence. In an unmarked patrol car, Officer Gwyn followed the blue Ford Expedition for several blocks and initiated a traffic stop after Hall failed to use a turn signal, in violation of S.C. Code § 65-5-2150. He notified fellow officers that he initiated a stop after Hall left the home. With Hall's vehicle stopped, Officer Gwyn approached the blue Ford Expedition and spoke with Hall, asking him for his driver's license, registration, and other information besides his address. Hall complied with the requests. Officer Gwyn then asked Hall to get out of the vehicle, took him to his unmarked patrol car, and gave him *Miranda* warnings. When questioned, Hall told Officer Gwyn that he lived at the residence subject to the search warrant and lived there alone.

At the same time as the traffic stop, law enforcement executed the search warrant and searched the residence. Officers found Hall's photo identification, $1,000 in cash, guns, and over ten pounds of marijuana. When Officer Gwyn learned that law enforcement had executed the search warrant, which was after *Miranda* warnings were provided, he detained Hall and his cousin, placing them in handcuffs. Officer Gwyn drove Hall and his cousin back to the residence. Hall was later arrested in connection with the contraband found inside the home. Officer Gwyn never issued a report or ticket about the traffic stop, and Hall was never charged with a traffic violation.

6

B.

On September 3, 2014, a federal grand jury indicted Hall for (1) knowingly and intentionally possessing with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D); (2) knowingly being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); and (3) knowingly using and carrying firearms during and in relation to, and possessing firearms in furtherance of, a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1). After the trial, a federal jury convicted Hall on all charges, and Hall timely appealed his convictions, which was this case's first foray here. On June 1, 2017, we vacated Hall's convictions because the district court abused its discretion in allowing the government to introduce evidence about Hall's prior possession and possession with intent to distribute convictions under Federal Rule of Evidence 404(b). *See United States v. Hall*, 858 F.3d 254, 264 (4th Cir. 2017).

On remand, another federal grand jury indicted Hall for (1) knowingly conspiring to possess with intent to distribute marijuana, in violation of 21 U.S.C. § 846; (2) knowingly and intentionally possessing with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D); (3) knowingly being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); and (4) knowingly using and carrying firearms during and in relation to, and possessing firearms in furtherance of, a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1). The conspiracy count was the only new charge. Hall took an interlocutory appeal, arguing that the Double Jeopardy Clause under the Fifth Amendment barred his retrial on the older charges because this Court previously determined there was insufficient evidence to support his convictions. We rejected Hall's

7

arguments and remanded for further proceedings. *See United States v. Hall*, 756 F. App'x 252, 254–55 (4th Cir. 2018).

Once back at the district court, Hall filed two motions to suppress. He first sought to suppress any evidence or statements obtained from Officer Gwyn's traffic stop, including his admissions that he lived at the residence being searched and lived there alone. He also sought to have an evidentiary hearing and invalidate the search warrant under *Franks v. Delaware*, 438 U.S. 154 (1978), claiming Investigator Carwell recklessly omitted material facts within his affidavit supporting the search warrant. The district court held a suppression hearing on June 3, 2019, and orally denied both of Hall's motions. With the motions denied, the government then filed a superseding information, only charging Hall with knowingly and intentionally possessing with intent to distribute marijuana and aiding and abetting another in the commission of the offense, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D) and 18 U.S.C. § 2. Waiving his right to a formal indictment, Hall pleaded guilty to the single charge in the superseding information. Thereafter, the court formally issued its written order denying Hall's suppression motions on August 15, 2019, and sentenced Hall to time served and ordered a two-year term of supervised release.

Hall appealed the denial of his motions to suppress to this Court. Once on appeal, however, the parties agreed to vacate Hall's conviction and remand to the district court for an evidentiary hearing to test the warrant's veracity under *Franks*. We granted the parties' consent motion to do so. Accordingly, the district court held a *Franks* hearing on September 29, 2020. On October 2, 2020, the district court denied Hall's motion to suppress under *Franks* and held that Hall failed to show Investigator Carwell intentionally

8

or recklessly omitted information from his affidavit that would have negated a finding of probable cause.

On December 7, 2020, Hall entered into a plea agreement with the government and once again pleaded guilty to knowingly and intentionally possessing with intent to distribute marijuana and aiding and abetting another in the commission of the offense, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D) and 18 U.S.C. § 2. On December 11, 2020, Hall again waived his right to a formal indictment, and a superseding information was filed. For a second time, the district court sentenced Hall to time served and ordered a two-year term of supervised release. Hall timely appealed the district court's orders denying his motions to suppress.

## II.

When reviewing a district court's rulings on motions to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. *See United States v. Drakeford*, 992 F.3d 255, 262 (4th Cir. 2021). We also construe the evidence in the light most favorable to the government. *United States v. Alston*, 941 F.3d 132, 136–37 (4th Cir. 2019).

## III.

### A.

We first consider Hall's argument concerning Investigator Carwell's affidavit submitted for the search warrant. Hall maintains that Investigator Carwell intentionally

and recklessly omitted material facts from his affidavit, and the inclusion of those facts would have undermined a probable-cause finding. According to Hall, based on the numerous omissions, the warrant was unsupported by probable cause and the evidence seized from his home was in violation of the Fourth Amendment under *Franks* and its progeny.

Under the Fourth Amendment, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . ." U.S. CONST. amend IV. In *Franks*, the Supreme Court held that a defendant may challenge the veracity of a sworn statement used to obtain a search warrant through a two-part subjective and objective inquiry. 438 U.S. at 155–56. To obtain an evidentiary hearing about an affidavit's veracity, "a defendant must first make 'a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit.'" *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) (quoting *Franks*, 438 U.S. at 155–56). This first prong is the intentionality prong. *United States v. Lull*, 824 F.3d 109, 114 (4th Cir. 2016). "Under the second prong—the 'materiality' prong—[a] defendant must show that 'with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause.'" *Id.* at 114 (quoting *Franks*, 438 U.S. at 156). A defendant must establish both prongs by the preponderance of the evidence. *Id.* If a defendant meets that burden, "the warrant 'must be voided' and evidence or testimony

10

gathered pursuant to it must be excluded."[1]  *Colkley*, 899 F.2d at 300 (quoting *Franks*, 438 U.S. at 156).

In addition to false statements, "*Franks* protects against omissions that are *designed to mislead*, or that are made in *reckless disregard of whether they would mislead*, the magistrate."  *Colkley*, 899 F.2d at 301 (citing *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986)).  Demonstrating the preponderance of the evidence under an omission theory is a "heavy burden."  *United States v. Haas*, 986 F.3d 467, 474 (4th Cir. 2021) (citing *United States v. Tate*, 524 F.3d 449, 454–55 (4th Cir. 2008)).  After all, "[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation."  *Lull*, 824 F.3d at 115 (quoting *Colkley*, 899 F.2d at 300); *see also Tate*, 524 F.3d at 455 ("[T]he very process of selecting facts to include for the demonstration of probable cause must also be a deliberate process of omitting pieces of information.").  After a *Franks* hearing in the omission context,[2] suppression is only warranted if a defendant demonstrates, by a preponderance of the evidence, that (1) the affiant's omissions were made intentionally or recklessly; and (2) the omitted evidence is material.  *Haas*, 986 F.3d at 474.  "Even if relevant, information is not material unless 'its

---

[1] A *Franks* violation is not subject to the good-faith exception to the usual remedy of suppression.  *See United States v. Leon*, 468 U.S. 897, 923 (1984); *Colkley*, 899 F.2d at 300; *see also United States v. Abernathy*, 843 F.3d 243, 257 (6th Cir. 2016); *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993).  Appropriately, the government is not invoking the good-faith exception here.

[2] Because Hall has already received a *Franks* hearing, we are not concerned with whether Hall made the necessary showing to obtain one.  We instead address whether Hall met his burden to suppress the evidence in question.

inclusion in the affidavit would defeat probable cause.'" *United States v. Wharton*, 840 F.3d 163, 168–69 (4th Cir. 2016) (quoting *Colkley*, 899 F.2d at 301).

"When issuing a warrant and making a probable cause determination, judges are to use a 'totality of the circumstances analysis.'" *United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The issuing judge must decide whether, under the totality of the circumstances, "there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Richardson*, 607 F.3d 357, 369 (4th Cir. 2010) (quoting *Gates*, 462 U.S. at 238). We generally give "great deference" to a judge's probable-cause finding. *United States v. Suarez*, 906 F.2d 977, 984 (4th Cir. 1990) (citation omitted). We find that Hall's identified omissions are not material because they do not alter the probable-cause determination.

First, Hall contends the following omissions about the CI negated a probable-cause finding: (1) as opposed to being a "first-time CI," he may have actually provided information about another "incident"; (2) he wanted to "work off" burglary charges; and (3) his CI packet contained no information about his history. Second, Hall claims the following omissions concerning the investigation and residence would further void probable cause: (1) law enforcement did not know of any illegal activity at the residence prior to meeting the CI; (2) the CI only mentioned that he *could* purchase drugs and guns at the residence and never stated he did so in the past; (3) there was no audio or video of the marijuana purchase; and (4) the CI purchased marijuana from an unidentified person within the residence.

None of these omissions—even when viewed together—change the probable-cause determination. At the outset, Hall's identified omissions are problematic for him to rely upon. For omissions about the CI, although Investigator Carwell believed that the CI was completing a controlled buy for the first time, there is no indication that the CI's "first-time" status or assistance in another "incident" would undermine his reliability. And nor is there any sign that the CI's burglary charges would have done so either. Regarding omissions about the residence, Hall's emphasis on the unknown identity of the drug seller neglects that the search warrant was also for a residence, not just a person. Further, the fact that the CI mentioned that he *could* purchase drugs at the residence ignores that he *successfully completed* a controlled buy there. *See United States v. Gondres-Medrano*, 3 F.4th 708, 716 (4th Cir. 2021) (observing that corroboration is required for confidential informants with no "track record of reliability" but emphasizing that known informants possess "enhanced reliability" because less corroboration is required since they expose themselves to criminal prosecution). And finally, neither we nor the Supreme Court have ever held that the existence or non-existence of audio or video recordings is necessarily decisive to a probable-cause determination. *See also United States v. Moses*, 965 F.3d 1106, 1113–14 (10th Cir. 2020) (finding that the "lack of suspicious activity" on a video did not undermine a probable cause finding when the affidavit was otherwise "strong"). And for good reason. Recordings may only constitute one part of a probable-cause determination, and we must consider all the circumstances. *Cf. District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018) (explaining that the totality of the circumstances test for a probable-cause analysis requires courts to view "the whole picture," precludes a "divide-

13

and-conquer analysis," and focuses on the "degree of suspicion that attaches to particular types of noncriminal acts" (citations omitted)).

Hall's identified omissions do not materially undermine the other facts or the probable-cause finding. Even including Hall's identified omissions within the affidavit, the facts remain clear. After apprising law enforcement of marijuana at the residence, the CI was searched prior to the controlled buy, and no drugs were on his person. Although the CI was not surveilled inside the residence, his travels to and from the residence were continuously surveilled by law enforcement. And Hall does not contest that the CI's possession of the marijuana only occurred upon the controlled buy's completion, which establishes probable cause to search the residence when coupled with the CI's initial tip. *See United States v. Clyburn*, 24 F.3d 613, 617–18 (4th Cir. 1994) (holding that there was probable cause when an informant "personally made a controlled purchase of crack cocaine at [a] house" the day before an officer submitted a warrant affidavit); *see also United States v. Haynes*, 882 F.3d 662, 666 (7th Cir. 2018) ("A properly executed controlled buy can establish probable cause, even when the tip that prompted it might not have been reliable." (citations omitted)); *United States v. Hart*, 544 F.3d 911, 914 (8th Cir. 2008) ("The reliable informant's tip and the controlled buy established probable cause."); *United States v. Warren*, 42 F.3d 647, 649 (D.C. Cir. 1994) ("We hold that a reliable informant's tip, combined with a controlled drug buy, established probable cause for the search in this case."). Put simply, Hall has not defeated the probable-cause determination by a preponderance of the evidence with his omissions.

14

Hall heavily relies upon *Lull* to argue the omitted facts were material to the probable-cause determination. But *Lull* is inapposite. There, law enforcement utilized a first-time informant to complete a controlled buy from Lull. 824 F.3d at 111. Although the purchase price of the drugs was $180, law enforcement provided the informant with $240 to purchase additional drugs if possible. *Id.* at 112. After the drug transaction's completion, the informant returned $40 to law enforcement but should have returned $60. *Id.* Eventually, law enforcement strip-searched the informant, found the missing $20 fall from the informant's underpants, and then arrested him on a felony charge. *Id.* The informant was discharged from service. *Id.* at 118. An affidavit in support of a search warrant for Lull's residence failed to disclose those reliability issues about the informant. *Id.* at 113. After setting aside information provided exclusively by the informant, there was no additional information identifying Lull as the drug seller or otherwise being connected with the drug transaction. *Id.* at 119. We found the omissions were material to the probable-cause determination because the only information remaining was that the informant purchased cocaine from an unknown man in a residence that may have belonged to Lull's mother, and we were not given reliable information about "who the man was, whether he resided there, or if he was alone in the residence." *Id.* Thus, we held that probable cause was ultimately lacking for the search warrant. *Id.* at 120.

Although there are some factual similarities, *Lull* does not control here. First, unlike *Lull*, there is no evidence that the CI here undermined his own reliability by either stealing from law enforcement or engaging in misconduct during the investigation. Thus, there are no facts that we must eliminate from Investigator Carwell's affidavit because the CI's

15

reliability has not been fundamentally questioned. Secondly, in *Lull*, when the officers discovered the informant's theft, they immediately discharged him. *Id.* at 118. Here, the CI was never discharged from his duties after assisting law enforcement with the controlled buy. Thus, we are still not concerned with the foundation of the CI's reliability as was the case in *Lull* and are presented with a clean controlled buy. And finally, the officers in *Lull* applied for a search warrant on the same day of the controlled buy, immediately after their troublesome informant was discharged and arrested. *Id.* at 112–13. That is not the case here. Investigator Carwell did not seek a search warrant until two days after the controlled buy's completion. We are simply not in *Lull*'s terrain.[3]

In sum, we cannot say that the omitted facts were material to a finding of probable cause, and thus need not address *Franks*' intentionality prong. Because Hall did not show that the omitted facts negated probable cause by a preponderance of the evidence, we affirm the district court's denial of the first motion to suppress.

B.

Hall next challenges the district court's denial of his motion to suppress his statements obtained during the traffic stop. He primarily maintains that the search warrant

---

[3] To the extent *Clyburn* conflicts with *Lull* by approving of controlled buys to establish probable cause, including a single controlled buy, we are bound to follow the earlier decision, which is *Clyburn*. *See McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004) ("When published panel opinions are in direct conflict on a given issue, the earliest opinion controls, unless the prior opinion has been overruled by an intervening opinion from this court sitting *en banc* or the Supreme Court.").

did not extend to his vehicle when it was several blocks away from the residence, and there was no independent justification for the traffic stop. We disagree.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, paper, and effects, against unreasonable searches and seizures . . . ." U.S. CONST. amend. IV. A temporary detention of a citizen during a traffic stop, even if it is limited in time and scope, is a seizure of that citizen within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10 (1996). However, "[b]ecause an ordinary traffic stop is 'a limited seizure more like an investigative detention than a custodial arrest,' we employ the Supreme Court's analysis for investigative detention in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), to determine the limits of police conduct in routine traffic stops." *United States v. Guijon-Ortiz*, 660 F.3d 757, 764 (4th Cir. 2011) (citing *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992)). We have stated that "when an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle." *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993) (quoting *United States v. Cummins*, 920 F.2d 498, 500 (8th Cir. 1990)); *see also United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008) ("Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." (citations omitted)). "Any ulterior motive a police officer may have for making the traffic stop is irrelevant." *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011) (citations omitted), *abrogated in part on other grounds by Rodriguez v. United States*, 575 U.S. 348 (2015).

17

A traffic stop's limited duration "'is determined by the seizure's mission—to address the traffic violation that warranted the stop,' meaning that it may 'last no longer than is necessary to effectuate that purpose.'" *United States v. Bowman*, 884 F.3d 200, 210 (4th Cir. 2018) (quoting *Rodriguez*, 575 U.S. at 354). Nevertheless, during traffic stops, officers may engage in "unrelated activity . . . [so] as long as that activity *does not* prolong the roadside detention for the traffic infraction." *See United States v. Hill*, 852 F.3d 377, 382 (4th Cir. 2017) (emphasis added) (citation omitted). And if an officer chooses to detain a driver beyond the scope of a routine traffic stop, he or she "must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place." *Branch*, 537 F.3d at 336 (citation omitted). "[T]he officers must either obtain consent from the individuals detained or identify reasonable suspicion of criminal activity to support the extension of the stop." *Hill*, 852 F.3d at 381.

When Hall left the residence, Officer Gwyn followed him. The seizure under the Fourth Amendment occurred when Officer Gwyn pulled Hall over for failing to use a turn signal, in violation of S.C. Code § 65-5-2150. Under our precedents, even though it is minor, Hall's failure to use a turn signal provided Officer Gwyn with a sufficient justification, and even probable cause, to stop the vehicle. *See Branch*, 537 F.3d at 335; *Hassan El*, 5 F.3d at 730. During the stop, Officer Gwyn was constitutionally permitted to order Hall out of the vehicle. *United States v. Hampton*, 628 F.3d 654, 658 (4th Cir. 2010); *United States v. Rumley*, 588 F.3d 202, 206 (4th Cir. 2009). So even when ordered out of his own vehicle, Hall was still only detained, not arrested. During this detention, Officer Gwyn cautiously provided Hall with *Miranda* warnings although he was not yet required

18

to do so, and this decision to do so is not necessarily a constitutional problem. *United States v. Soderman*, 983 F.3d 369, 376–77 (8th Cir. 2020) (holding that *Miranda* warnings are not required during traffic stops and stating that "[a]lthough stopped drivers are detained, they are generally not in custody during the roadside questioning that is permitted during a traffic stop" (citing *Berkemer v. McCarty*, 468 U.S. 420, 439–40 (1984))); *United States v. LeQuire*, 424 F.2d 341, 343–44 (5th Cir. 1970) ("Nothing in *Miranda*, or in any other case, requires that in this type of routine, on-the-scene questioning, the person detained must be given the *Miranda* warnings." (emphasis added)).

Despite receiving *Miranda* warnings when none were required and before he was handcuffed, Hall proceeded to voluntarily answer Officer Gwyn's questions about his residence during the detention. *See United States v. Frankson*, 83 F.3d 79, 82 (4th Cir. 1996) ("[A] defendant's 'subsequent willingness to answer questions after acknowledging [his] *Miranda* rights is sufficient to constitute an implied waiver.'" (citations omitted)). We have previously permitted officers to ask limited questions about a stopped individual's travels during traffic stops, and Officer Gwyn's questions do not exceed those narrow confines. *See United States v. Hill*, 849 F.3d 195, 201 (4th Cir. 2017); *United States v. Vaughan*, 700 F.3d 705, 712 (4th Cir. 2012). So Officer Gwyn was permitted to ask about Hall's residence during the traffic stop if his questions did not prolong the detention. *Hill*, 852 F.3d at 384. Hall has not argued, nor is there evidence before us, that either Officer Gwyn's questions or conferral of *Miranda* warnings impermissibly extended the traffic stop. *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were

19

violated by the challenged search or seizure." (citations omitted)). Under these facts, and viewing the evidence in the light most favorable to the government, we are thus compelled to conclude that Officer Gwyn's traffic stop was justified by Hall's traffic infraction, and the evidence he obtained therefrom was not subject to suppression.[4]

Hall also challenges a change in Officer Gwyn's testimony. Although Officer Gwyn specifically recalled stopping Hall's vehicle for a turn-signal violation in his 2019 testimony but only mentioned a general traffic infraction in his 2015 testimony, this ultimately goes to Officer Gwyn's credibility, and Hall falls short of establishing any clear error in this regard.[5] *See United States v. McGee*, 736 F.3d 263, 270–71 (4th Cir. 2013) (finding no clear error when a defendant argued that an officer's testimony about a non-

---

[4] Before this Court, Hall argues, for the first time, that his traffic stop involved an arrest without probable cause. As noted above, we only hold that Hall's statements are not subject to suppression because they were made during his detention and before any formal arrest. *Soderman*, 983 F.3d at 376–77. Moreover, especially because an issue about Hall's arrest was never developed at the suppression hearing, and we do not know what Officer Gwyn specifically knew when he learned of the search warrant's execution—which preceded Hall's handcuffing and placement in the police vehicle—we only address the legality of the evidence obtained from the traffic stop and take no position about the propriety of the arrest. *See United States v. O'Connor*, 658 F.2d 688, 693 n.7 (9th Cir. 1981) ("Because we have decided that Davis was not under arrest, we need not address the difficult question of whether there was probable cause to arrest."); *Crowell v. Zahradnick*, 571 F.2d 1257, 1259 n.3 (4th Cir. 1977) ("[W]e will not ordinarily consider an issue not presented to the district court when it is raised for the first time on appeal." (citation omitted)).

[5] Although Officer Gwyn conceded that he never issued a report or ticket for Hall's traffic stop, this is of no moment because he also testified that it is normal to not issue tickets for turn-signal violations, and he gives "verbal warnings all the time" as opposed to written warnings and reports. J.A. 132, 137–40. He also testified that he was sure that the traffic stop was for the failure to use a turn signal. J.A. 132.

operative brake light was "uncorroborated and fatally undermined" by other testimony, and the defendant only proffered circumstantial evidence to rebut the officer's testimony); *United States v. Murray*, 65 F.3d 1161, 1169 (4th Cir. 1995) ("[I]t is the role of the district court to observe witnesses and weigh their credibility during a pre-trial motion to suppress." (citation omitted)). Accordingly, the district court did not err in denying Hall's motion to suppress his statements from the traffic stop, and we will not disturb its ruling.[6]

IV.

For the foregoing reasons, the district court's orders denying Hall's motions to suppress are

*AFFIRMED.*

---

[6] The parties also dispute other potential justifications for the traffic stop, including the search warrant and automobile exception to the warrant requirement. Because we hold that Hall's traffic infraction provided Officer Gwyn a sufficient basis to stop Hall, and there is no evidence suggesting the stop was impermissibly lengthened, we need not address whether the traffic stop was justified by either the search warrant or the automobile exception to the warrant requirement. *See United States v. Harris*, 39 F.3d 1262, 1269 n.4 (4th Cir. 1994) ("In view of our holding regarding reasonable suspicion, we need not address this alternative justification for the stop.").

WILKINSON, Circuit Judge, concurring:

I am happy to concur in the fine majority opinion in this case. I write briefly to underscore my agreement with its statement that Hall received *Miranda* warnings when "none were required." Majority Op. at 19; *see also United States v. Soderman*, 983 F.3d 369, 376–77 (8th Cir. 2020) (holding that routine traffic stops are not custodial and do not require *Miranda* warnings). The police did Mirandize in this case for both good and sufficient reasons, but I would not want such warnings in traffic stops to become de rigueur.

Requiring *Miranda* warnings at the outset of a traffic stop would be quite ill-advised. Take a driver with a broken taillight or in excess of the speed limit. Such infractions are obviously undesirable. But they can be committed, even inadvertently, by almost anyone. To require *Miranda* warnings at or near the outset of these stops would be a severe overreaction. In fact, these warnings would scare many an ordinary motorist to death.

*Miranda* warnings are important. They may fairly be described as a cornerstone of liberty in our republic. They also carry an imputation of criminality, which means they should not be casually dispensed. Many traffic stops do not result in a ticket. Even fewer mature to the point of custodial interrogation where *Miranda* warnings are indeed required. There are enough valid settings for *Miranda* without the addition of routine traffic stops.

I make what seems an obvious point, because it would take rather little for courts to push police departments to adopt *Miranda* warnings as a protective measure near the inception of a stop. Roadside encounters between the police and the citizenry are apprehensive enough without adding *Miranda* warnings to the mix. Importing Fifth and

22

Sixth Amendment concepts to these interactions would push policing even further from a collaborative enterprise to the sort of adversarial model which many communities are attempting to ameliorate. Uttering warnings of such severity to drivers as a matter of course would make police more feared and less trusted. I write simply to endorse the sound conclusion in the majority opinion.

WYNN, Circuit Judge, concurring:

I concur with the majority opinion. However, I write separately to respond to the concurring opinion. Although the issue discussed in the concurring opinion is interesting, it is not a matter before us in this case. The police are well aware of the need for providing *Miranda* warnings, the circumstances in which such a need arises, as well as any corresponding limitations thereto. The teachings of *Miranda v. Arizona*, 384 U.S. 436 (1966), have been with us for over fifty years. So, while the concurring opinion is well intentioned, we need not offer advice to the police on issues and facts not currently before us.